Thank you, Your Honor. Good morning. May it please the Court. My name is Quentin Rhodes. I'm here on behalf of the plaintiffs, Montana Shooting Sports Association et al. The Montana Firearms Freedom Act is about two things. First, it's about firearms, as the name implies, but it's also about freedom. And the reason that it's about freedom is it's an attempt by the state of Montana to carve out dual sovereignty for itself when it comes to gun regulation. The effort is one to give people in Montana who wish to manufacture and trade in firearms a safe harbor where they can use certain manufacturing techniques to stamp the firearms with a made-in-Montana symbol. And if they do, and if they don't transport those firearms or take those firearms or sell those firearms to people who take them out of the state, in other words, outside the boundaries of the state of Montana, they don't have to otherwise comply with federal gun regulations. The effort is to give people in Montana the opportunity to make these guns, but it's also an effort to try to define the bounds of dual sovereignty with respect to intrastate commerce. And the reason that Montana has tried to do that is because it is, so to speak, caught in the crossfire between the congressional war on violent crime in urban areas and the violent criminals who reside there. Montana has fewer than 1 million people, and so consequently fewer than 1 in 300 Americans live there. We have seven cities that are greater than 20,000 people. Everyone else lives in a town or a rural area. And so the public policy that's promulgated by the U.S. Congress in the Gun Control Act and the National Firearms Act doesn't apply in Montana. Well, but wasn't it settled a long, long time ago that Congress speaks for the nation? Its powers are not unlimited. But Montana is not free to say, well, we want to do things differently. Well, Your Honor, that's what we're urging the Court to create a test for. And the reason that we want to do that is because of the power and the force of dual sovereignty in protecting individual rights. Your brief sort of concedes that as a matter of case law, I think the phrase used is, our hands are tied. Is that correct? Well, that's right, Your Honor. And indeed says in so many words that the Supreme Court's Commerce Clause sure as prudence has, your adverb, not mine, improvidently altered the very form of American government, reading out dual sovereignty and stripping from the states all independence of policy or action. Well, we're an intermediate court of appeals subject to the Supreme Court's improvident problem. Yes, Your Honor, I think it can. The way that I would suggest that this Court can do something about the problem, if it sees the lack of dual sovereignty as a problem, is to apply the intermediate scrutiny test to facts such as these. One of the great criticisms What I just read from your brief characterized the Supreme Court's jurisprudence as improvident, but also said that it's read out this dual sovereignty. And as I say, your brief's already said, our hands are tied. I'm not denigrating the position you've taken. I'm just wondering, is there anything that this Court can do about it, or are we just a way station in your attempt to go to the Supreme Court and get it to rethink its Commerce Clause jurisprudence? I think it's more than a way station, Your Honor, because the Supreme Court has not considered a test besides the rationality test for this particular issue. And I don't see in the Supreme Court's case law where the issue has arisen. And one of the great criticisms for the dual sovereignty argument that we're making is that, well, what about environmental law or civil rights law or other kinds of important congressional policies? Are you being realistic? Do you really want to rule? Do you really want the courts to rule that Congress can't legislate in these areas? And the answer is no. We are being serious, but we don't want to preclude congressional power in legislating in these important areas. But we think that if the intermediate scrutiny test is applied, that certain of these arguments will be won by the States and certain will be won by the Federal government. And you can see in this intermediate scrutiny case law that the questions are never a foregone conclusion. When you apply the rationality test, there's always a foregone conclusion that ultimately, I mean, there are no exceptions that I can think of, but ultimately, the courts decide that the government has the power. Kennedy. What do you want to supply the intermediate scrutiny test to? The issue whether the possession and manufacture of guns in Montana is a completely compelling interest of the Federal government? No, Your Honor. The way I understand the intermediate test is if there's a substantial relationship between the congressional regulation and an important government or congressional objective, then the Congress has the power to act. And it's our view that the Montana Firearms Freedom Act does not purport to apply to interstate commerce. If one of these guns is taken into interstate commerce, we absolutely concede that you have to comply with the Federal regulatory regime. But if it's left in Montana, does the U.S. Congress have a substantial interest in regulating guns in Montana? Wasn't that decided in Raich as to marijuana? Why are guns different? Well, in this case, the guns are different for two reasons. One, they're not fungible in that Montana Firearms Freedom Act guns are stamped, made in Montana, and they've got to be stamped that way in some clear spot that makes them easy to identify. It's not going to do you a lot of good if you find that gun after a crime has been committed in Montana or anyplace else. Well, if I understand your question, Judge Clifton, it's kind of a practical one. In other words, you can't face these guns if they don't have serial numbers and they're not licensed. Or it doesn't try to disregard practicality. I mean, it is a practical problem, isn't it? Well, it is a practical problem. But the flip side of that issue, Your Honor, is that there's no evidence and I don't think it's common sense to suggest that there's going to be greater levels of crime anywhere in America, Montana or some urban area, if people are making guns in Montana. Well, couldn't Congress make the decision that there's a substantial relationship between unregistered firearms and ill effects? And it doesn't really matter if the unregistered firearms are stamped made in Montana or not. Well, currently, as it stands, Your Honor, firearms, in my understanding of Federal law, don't have to be registered. There's a regulatory regime under which it's controlled how they're manufactured and traded in, but a firearms owner doesn't have to be registered with the Federal government to have a gun. And my understanding of what the Congress is trying to do here is to help local law enforcement prevent guns from coming in from out of State. And it's their view that guns coming in from out of State is somehow contributing to urban crime and urban violence. And the point is, is that the word gets out the way to get a firearm without a gun or without a registration number, without some serial number of some kind, is to go buy one of those Montana guns. Isn't it logical to conclude, or at least isn't it more than rational, isn't there a substantial connection such that Congress could conclude that, well, we shouldn't permit the introduction of firearms without serial numbers? Your Honor, it would be our view that, as I say, there's only a million of us in Montana. And there's not going to be a connection, a factual connection, even if Congress had made such a finding. I don't think that it would. I don't think that it could, because I don't think that our manufacturing firearms... Let's say you've got a source of guns without serial numbers. I mean, my first-hand experience is probably limited to watching Law and Order and so forth, but you hear enough things about the serial number has been removed or scraped off or something like that. Suddenly, if you want a gun without a serial number, the way to get it is to buy one of those Montana guns. You don't think there are going to be guns sent from Montana to Chicago and Las Vegas and Los Angeles and maybe even Portland? Well, Your Honor, I think that's a good point, because I think, as it stands right now, I think criminals in urban areas are stealing guns and they are scraping the serial numbers off of them and they are using them in crimes. And whatever regulatory regime they're violating when they do that, it doesn't prevent them from doing that. That's an unusual path you're going down. Because law is violated, we ought to give up on law? No, Your Honor, I think it's the opposite. Because the law is violated, there's no reason to give up on law. So we have laws that require serial numbers, and now Montana wants to introduce a set of firearms that don't have to comply with that regulation and Congress can't rationally decide or can't decide their substantial connection? And even by the intermediate test you're proposing, I'm baffled as to how it is that this legislation isn't something that Congress couldn't reasonably conclude ought not to be permitted. If they're in interstate commerce, I would agree, Your Honor, but if they're only in Montana, they're not in interstate commerce. Yeah, well, how are you going to keep those firearms from leaving Montana? You got guards at the border? I don't think you're empowered to stop anybody anyway, but you don't have guards at the border, do you? No, Your Honor, we don't. So if my place to get firearms is one of those Montana guns, you don't think there are going to be large shipments of those guns outside of Montana? I don't think there'll be large shipments, but as it stands right now, people are stealing guns in all 50 states and using them for crimes. This law is not going to change that one way or the other. What this law does affect, however, is... Well, that decision for Congress, you know, whether it facilitates it, makes it easier, but your argument also falters for the reason that, as the briefs in this case show, they're not going to change. How many other states have similar laws now? And how many other states are contemplating similar laws? So if, you know, all 50 states have the same law, what's going to happen? Right? It'll be a complete mess, won't it? The Federal Firearms Act won't mean a thing then. If every state has its own law on, you know, firearms, then, you know, on the theory, I suppose, that we're going to keep all the guns made in California or in California, and all the guns made in Oregon and Oregon, and every state has a law like that, what's going to happen? You can't make a sensible argument that you're going to still be able to regulate unlawful possession. But going beyond that, you see, what I don't... I'm still trying to understand is, this is more basic. The Montana law is only a declaration. It's not a law. It's a declaration. It's a declaration. It doesn't purport to bind, you know, we'll say the ATF in what prosecution is to make, does it? I mean, how? You know, it doesn't purport to do anything. It's a declaration. It's like the Declaration of Independence, you know. It doesn't give any concrete rights to anybody, does it? Well, Your Honor, I think it does with respect to guns that remain in the state of Montana and don't leave. How does it? In other words, your argument has to be that, well, I guess it is that Montana has the authority to prevent the enforcement of federal law, right? Outside of interstate commerce, in other words, in intrastate commerce, whether Montana has that authority, we would argue that the Constitution does not give the authority to Congress to regulate that activity in Montana. So it's not a matter of what Montana does declare or not declare. It's a matter of what the Constitution provides, isn't it? That's right, Your Honor. So it's almost irrelevant what this, you know, Montana Firearms Freedom Act says, isn't it? It's just a declaration to say this is the way we feel and, you know, the Montana legislature feels. Well, in our view, that's... There's no penalty for it? You know, it doesn't say, you know, any ATF agent who institutes a prosecution is going to get 30 days in jail, right? There's no penalty for violating that act? There's no way to enforce it, is there? We wouldn't argue that the state of Montana had authority to prosecute ATF officers. What we're arguing is that the ATF officers under federal law wouldn't have the authority to prosecute ATF officers. We're not arguing that Montana could arrest them or something of that nature. So your theory depends on... Well, your case depends on the theory that Montana, by unilateral declaration, can determine the enforcement of a federal statute, right? Your Honor, we... Well, our argument is that Montana has invoked its Tenth Amendment rights to give its citizens a direction as to what it will allow under or what it reserves to itself with respect to powers that are not enumerated to the U.S. Congress. It's not a comprehensive list of all the powers that are reserved to the states, but it's a specific one that's designated for the use and benefit of the citizens of Montana. All right. Now, whether or not those powers are reserved to the states is really not affected by this declaration by the Montana legislature, is it? I wouldn't... They're either reserved by the Tenth Amendment or not. I wouldn't disagree with that. I think that's right, Your Honor. So this Montana Firearms Freedom Act is really not determinative of what the federal government can do. It's the Tenth Amendment. That's right. I would agree with that, Your Honor. So why are we arguing about this declaration from Montana? It doesn't make a difference. In our view, it does make a difference because it's an act by the Montana legislature to give its citizens direction as to what it believes they're allowed to do under the Tenth Amendment and the powers... So it's an attempt to give it direction. In other words, you know, it's like its advisory, its help, which is, well, you know, we think you can do this. That's all it is. Well, and it also gives to them what their safe harbor is under Montana statutory law. So it protects them against prosecution for Montana statutory violations. True. Yes. But that's the only legal effect of it. Well, I think that that's right. The legal effects, I mean, the legal prescription that exists, in our view, arises under the inherent authority of Montana. You've got Article I... That's your Tenth Amendment argument. But that's not for the Montana legislature to adjudicate. Well, I think it is, Judge. And the reason I think it is, is I think it's more than just a Tenth Amendment argument. It's also an Article I argument. And we think that the Tenth Amendment requires the Federal courts to give the enumeration clause a narrow stricture when it comes into some specific right that a State, or I should say a power, that a State has declared, it has reserved for itself. In this case, firearms manufacturer within the bounds of Montana. And the way the statute works is it gives specific and clear instruction to the Federal courts what the State of Montana views to be a power that is reserved to it and has not been delegated. So it's a — it creates a clarity in the minds of... The verb I used was adjudicate. And I don't hear you really disagreeing with that. You're telling us that this is a statement by the Montana legislature as to what the view of the Montana legislature is on this Federal constitutional issue. But the Montana legislature doesn't claim for itself the right to be the final decision-maker on that, does it? Well, not with respect to interstate commerce, Your Honor. And of course... Or even respect to the — how great the Federal commerce power goes in reaching into the State of Montana. I mean, we've had the medical marijuana decision, which Judge Bea cited a few minutes ago. Is Montana saying, well, we don't have to pay attention to that if we decide it doesn't apply within Montana? No. The attempt here with this statute, Your Honor, is to try to create a distinction between fungible... It's trying to key up — tee up a case, but that's a case to be decided by the U.S. Supreme Court. Well, that may be, Your Honor. What I would encourage the Court to consider is two things. First, Justice Kennedy's dissent — or, excuse me, concurrence in the Lopez case, where he talks at length about how the courts need to fashion rules that provide for dual sovereignty without necessarily overruling past precedent, but to fit new circumstances within that dual sovereignty theory. And we think that the Court could do it by looking at the Commerce Clause case law and looking at — at — at strictly intrastate commerce that's been set up by the Montana legislature here, and applying a test that is more — or less deferential, I should say, to Congress than the rational basis test. And I would reserve a few minutes. Thank you, Your Honor. You may. We'll hear from the amicus. Let me see. I guess you have more than one. May it please the Court. Nicholas Dranius, on behalf of the Goldwater Institute and the Cato Institute, is amici supporting appellants in this matter. Your Honors, personally, I would love it if this Court would overturn Wickard and any number of related cases, but there is no need to do so. This case presents an issue of first impression that can be resolved by reference to first principles without overturning any existing U.S. Supreme Court precedent. And so I respectfully disagree on behalf of amici that — that anything is foreclosed before this Court. Most importantly, we have to emphasize that this case involves a claim of implied power under the Commerce Clause. There are no articles in transit across State lines. There are no instrumentalities involving interstate commerce. There is only the claim that allowing manufacturers of this sort will have the substantial effect under the Wickard test on interstate commerce. Now, that test is a test meant for the implied power confirmed under the Necessary and Proper Clause. That power is limited, as we have most recently seen — and it's been a couple of years since I wrote my brief — but in NFIB v. Sebelius, the Supreme Court has very clearly stated that the implied power under the Commerce Clause, as confirmed by the Necessary and Proper Clause, is limited by the letter and spirit of the Constitution. And those are not horatory words. They actually mean something. And that — what they mean is, is that the context of the Constitution's system of dual sovereignty cannot be forgotten whenever — Haven't all these issues been decided in our circuit by Stewart? It has not, respectfully, Your Honor. Stewart did not involve a clash with an existing State law. And that is important, Your Honor, because States have, under their police powers, the ability to declare and codify rights. And that's why the MSSA is actually a substantive import, because, in fact, the Declaration of Rights in the Montana Constitution is nothing more than a declaration of rights. And the Founders, as we saw in Federalist 28, 31, 33, 51, all understood that the Ninth and Tenth Amendments were meant to work in tandem to restrict Federal delegated powers by reference to codified statements of rights in State constitutions and in State law. Now, I have to concede, Your Honor, it's been some time since the Court has concerned itself with the Ninth Amendment. But there are cases on — that are relevant. One of the best cases to look to in terms of the Ninth Amendment in this context would be the Acme v. Benson case from 1935, a district court case which emphasized that manufacturing is closely related under the Ninth Amendment to the rights of property under the Fifth Amendment and, therefore, is protected by the Ninth Amendment. In this case, the Ninth Amendment's protecting related forms of manufacture to the Second Amendment. In this particular case, Stewart preceded Heller. It preceded McDonnell. It preceded the determination that there is a fundamental right protected by the Second Amendment. And now that we know that there is, we can pull into play the Ninth — Not only did it precede, but as we know from Henry, Stewart was overruled and footnote 6 by Heller specifically, finding that there was an individual right. But at the same time, there was no ruling in Henry or in Stewart or in Heller, more importantly, as to the spread of the Commerce Clause power, was there? You're correct, Your Honor. And what's significant is — In fact, Henry says in so many words that Heller doesn't affect its Commerce Clause — Stewart's Commerce Clause holding at all. With respect to it, Your Honor, we're still developing the case law under the Second Amendment. We are where the First Amendment was in the 1930s with regard to the Second Amendment. Wait a minute. This is not a Second Amendment case, is it? Your Honor, it is by virtue of its reference to the Ninth and Tenth Amendments, because the Ninth Amendment can only be construed and enforced in conjunction with an articulated right such as the Second Amendment. And what we're arguing, Your Honor, is that this case should not have been dismissed on a 12b-6 motion. There should have been an opportunity to develop the legal theory that was advanced by the plaintiffs because it is now plausible, clearly so, under U.S. Supreme Court precedent. I want to emphasize a couple of additional points. On the heightened scrutiny test, we make the point that under Katzenbach and a number of cases interpreting the enforcement power under the Fourteenth Amendment, the scrutiny applied in the Fourteenth Amendment enforcement power context has always been — has been heightened, especially in recent years with Flores — with Horn v. Flores and so forth. We believe that because the Fourteenth Amendment's enforcement power has been analogized for over 120 years to the Necessary and Proper Clause power, in the sense that both are incidental powers, that there is no reason to refrain from applying such heightened scrutiny to a claim of implied power under the Necessary and Proper Clause. Only the — the heightened scrutiny would look different than the plaintiff has supposed. It would be a question of congruity and proportionality to test whether, in fact, the claim of Federal power is incidental rather than superseding the claimed main power. And that is what has never happened in the lower court. There's never been discovery. There's never been a development of facts or the legal theories in light of discovery. And we believe that if there were discovery in this case, that it would reveal that there — that the claim of incidental power to regulate this sort of manufacturing activity would be vastly greater than the main power of — of the ability to regulate interstate commerce, which would preclude it from being an implied power. For example — But what discovery would speak to that? Excuse me, Your Honor? You said what — discovery, you're saying, is necessary. What discovery would speak to the question you just posed? Well, first of all, Your Honor, keep in mind how strange the manufactured product is in this case. It's not just that the receiver has to be stamped by a state of Montana stamp, which is a significant thing. The receiver is a necessary part for every gun. But it has to be constructed of materials primarily originating from the state of Montana. Now, I'm not too familiar with Montana, but I think that would strictly — that would vastly limit the quantity of weapons. I'm not going to go very far, though, because there's no reason why this law couldn't be adopted. Indeed, we've been told that other states have considered the same thing. No reason why a state, perhaps with a more diverse array of natural resources — and Montana probably has lots of natural resources by itself — so to suggest to me that, well, this really shouldn't count because you couldn't make a real great gun out of it isn't very persuasive. Well, if I may, Your Honor, just to go back to Wickard, one of the sad facts of Wickard is that all of the facts are stipulated to by both parties. In fact, even the economic effects of the consumption of wheat was stipulated to in Wickard. That is why Wickard was lost, in my judgment. And that is what is different about this case if we allowed it to be litigated in light of discovery, is you would find that in Montana there would be no substantial effect. There would only be a trivial effect on the interstate market in firearms if these kinds of guns were actually built. Now, even if other states adopted similar laws, note that that would be an expansion of Wickard, not only aggregating the conduct within one state, but now purporting to aggregate it across multiple states in order to show an incidental — in order to show that it reaches — that the Commerce Clause in its implied reach can reach this conduct. That, Your Honor, we should not do. It's already gone as far as it should with Wickard's aggregation principle. We should now take advantage of a question of first impression where there's a direct clash between a declaration of state rights that are guaranteed under the Ninth and Second Amendments, or at least plausibly arguably guaranteed under the Ninth and Second Amendments. We have a clash between a state declaration of rights which is relevant to determining whether or not a claim of implied Federal power violates the letter and spirit of the Constitution. We should head back to the lower court and we should have facts generated and discovery conducted to see just how substantial an effect this law would have on interstate commerce. And if it is indeed trivial, then there should certainly not be any ability to rely on Wickard, which was based on stipulated facts. Suppose it would be trivial in Montana but not trivial in Ohio. Would we have a constitutional regime which would change Congress's commerce power depending upon what states affected? Respectfully, Your Honor, yes. In fact, that was the Constitution's design. To quote Joseph Story, the original design of the Constitution was one of complete decentralization. And the whole point of the Ninth and Tenth Amendments, again, according to Federalist 28, 31, 33, 51, is to allow for states to use the powers that they have under their traditional powers of governance to define and protect the rights that were not delegated to the Federal Government in order to make it clear that the delegated powers of the Federal Government do not trench on those rights. This is the – the fundamental role of the Ninth and Tenth Amendments is to remind the courts and society of the context of the Constitution. The powers that the Federal Government claimed cannot trench on the rights retained by the people, cannot trench on the police powers that codify those rights in the states. And the difference between this case and Raich and all other cases preceding this is that there was not a clash between an exercise of state sovereignty that falls squarely within the ordered conception of liberty protected by the Bill of Rights, where you should see that the letter and spirit of the Constitution cannot allow for implied power to reign. Well, there was a clash in Raich between Federal and state power, wasn't there? Your Honor, respectfully, not within the conception of ordered liberty contained in our Bill of Rights. The Bill of Rights has a protection on the rights of the people. Well, you want to overrule Raich. Your Honor, there's no need to overrule Raich. Raich is distinguishable because, number one, it – I thought your argument was that the declaration of the Montana Firearms Freedom Act was a declaration of the traditional power of a State to protect its citizens by a means such as allowing them to have guns, and that this traditional power under ussery was a power which should not be invaded by the Federal Government. Is that not your argument? That is one way to frame the argument, Your Honor. Well, but if the Federal Government finds that the interstate travel of guns does harm the citizens of the United States, can't it overrule what Montana does? Not with respect to an exertion of State sovereignty that protects constitutional liberty. That is the decentralization of power that is guaranteed by our Constitution. And furthermore, Your Honor, I see that I'm out of time. I just wanted to emphasize, just as this Court has said that the Federal Government can break a few eggs to make an interstate omelet, the Founders designed our system with the risk that a few States might go wrong in their decentralized policies, but nevertheless chose a system of decentralized policies and decentralized protections of liberties, which is precisely what the MSSA does. Thank you. We'll hear from the Attorney General. Thank you, Your Honor. May it please the Court. Mark Freeman for the Attorney General. All the conversation this morning has been about the merits of Mr. Marbitt's claims. I'd like to start, if I may have a minute, with the standing question. That's the first initial basis on which the district court and the magistrate judge ruled, and we think it's right, and for this reason. This is a pre-enforcement challenge to the Federal criminal laws, not just one criminal law, but the entirety of the Federal firearms laws. Mr. Marbitt wants to make the Montana Buckaroo a .22 rifle and sell it. But as far as we know from the record, and he did submit an extensive declaration, begins on page 164 of the excerpts of the record, he's never made a gun. He doesn't say in that declaration that he has ever made a gun. Now, I want to emphasize, as ATF said to Mr. Marbitt, it doesn't violate Federal law to make a gun. Mr. Marbitt could make the .22 rifle, he could show it, he could complete it, and then at least we would know. But doesn't he affi that he cannot sell a gun unless it is not licensed under Federal law? Well, he cannot engage in the business of selling guns, Your Honor. I thought his affidavit was pretty clear that his buyers won't buy the gun if it is licensed by Federal law. Oh, I think he does make that claim. But our point is that we have to take that as to be true. We can take that as being true, but one thing we also have to do, we're relying on Mr. Marbitt here. One thing we also have to take from the record is that he has never said that he has actually assembled this gun. And before a district court gives any ---- So you want him to assemble a gun and be busted and then bring the claim, right? No, no. That's just my point, Your Honor. He wouldn't be busted. It is not a violation of Federal law to make these guns. Just like it is not a violation of Federal law for him to make the ammunition that he made. There's no money in it to make a gun for himself. Well, he can make it for himself, Your Honor. But there's no money in it. So lots of people do things for commercial purposes that they may or may not be interested in doing it for themselves. That's exactly right. But before a Federal ---- let's look at his complaint. What Mr. Marbitt wants is an injunction against the Attorney General of the United States barring the United States from enforcing any Federal firearms law against a manufacturer of firearms. And he's never manufactured firearms. He can do it legally, but he himself in the record expresses doubt about whether he can do it. This is at page 209 of the excerpts of record. And when he wrote an e-mail to his supporters and said, I need to show my standing, can you tell me that you'd buy my gun, he says, if I win this lawsuit and if I can actually get them made, he actually says that twice on page 209, if, capital letters, I can actually get them made. That is one heck of a contingency for someone who's coming into Federal court and asking for prospective immunity from all Federal criminal laws. This Court does not sit, and Federal courts generally do not sit, to bless in advance business plans that may never come to fruition. If you did, that's the only thing the Federal courts would be doing. Now, we're not obviously running away from the merits of Mr. Marbitt's claims. I'm happy to talk about them, but we do think that there's a ---- Kennedy, he argues, I think, two bases for standing. One is the one you addressed on threat of prosecution, but the other is, what would you ---- more plainly, economic injury. That's right. Well, and I think the magistrate judge dealt with that correctly, Your Honor. The magistrate judge said, Mr. Marbitt is not now and never has been in the business of making and selling firearms. Well, is that what you need to have standing? You have to be in the business already? Or you have to be about to go into that business and have a genuine threat of imminent enforcement. That's what this Court said on Bonk in the Thomas v. Anchorage Equal Rights Commission case. The point is, before you come into court and say, I want prospective immunity from this vast swath of Federal criminal laws, you've got to be close and have been threatened with enforcement. And even without touching the threatened with enforcement question, we don't think it's too much to ask Mr. Marbitt if he's going to seek this kind of injunction against Federal criminal enforcement, that he at least show that he can make a firearm that doesn't blow up when he pulls the trigger. Now, maybe he can, maybe he can't. But nothing in this record supports that. And I would note, he has an extensive declaration in which he talks about his sportsman, his shooting practice, all the many rounds he shoots in a year, and we have no reason to doubt any of that. But the one thing that is conspicuously absent from that declaration is any assertion that he has ever made a firearm. And, you know, a sportsman does not a gunsmith make. And we think in order for him to have standing, to come into court and ask for this sort of extraordinary relief, he should at least be required to do that. Kennedy, do you think it's a constitutional requirement that a prototype be made? I'm sorry, I didn't hear you. It's a constitutional requirement for standing that he make a prototype. I think then we would be much closer, yes, because what he wants is immunity from selling, engaging in a business of selling this gun. We think that he should at least show that he can make the gun. And think about this, think about this the other way around. Suppose the district court had an outstanding ration steward. So if he goes back after this lawsuit and makes a gun, then you will withdraw your standing challenge. I think we would have, we would think hard about it, Your Honor, but we would. Suppose he hires a gunsmith. What if he hired a gunsmith? Then he'd be closer to being in the business of making and selling a firearm. Look, this, this, this, I know this sounds like a technical point, but it is an important point and one on which this Court and the Supreme Court have repeatedly insisted. And that is because, take the environmental cases where we say you actually have to travel to the place that you want to litigate about before you. It's an important point, and what I don't know to what extent, you know, the government made these same arguments in the district court that you're making now. And in this situation, you think the fair thing to do is to send it back and give him leave to amend his complaint? I don't think there's any reason to do that, Your Honor. First of all, the standing was litigated both before the magistrate judge and before the district judge. The district judge noted that no exceptions were made by Mr. Marbut to the findings of the magistrate judge as to the facts. He's never claimed in his brief or anywhere else that he omitted something from a declaration. He, as far as we know, Mr. Marbut made all the claims that he wanted to make. And I want to emphasize this point. It is not a violation of Federal law for Mr. Marbut to put together this gun. And if he wants an injunction against all Federal enforcement for making and selling guns, it doesn't seem too much to ask that he do that. Now, on the merits of the claims, I think, as counsel told us this morning, if effectively conceded, as they have to, that the Commerce Clause challenge is foreclosed under Raich and under Stewart. And I would just note that the Stewart case is particularly illustrative because in the first round, of course, the Court held that the mere possession of a machine gun was outside of Congress's commerce power. That was vacated after Raich was sent back, and then Chief Justice Kaczynski, Chief Judge Kaczynski, issued the new opinion, which he explained the reasons why Raich required the outcome that the Court reached. One thing that's interesting is that even in the first opinion, the Court agreed that the manufacture and sale of machine guns is, the Court's words, quintessential economic activity within Congress's power to regulate. Stewart was only a hard case, and indeed, Raich was only a hard case, because it involved the mere possession of items that never moved, that were never the subject of any commercial transaction at all. So the Commerce Clause cases, as I think counsel recognizes, foreclose his right to relief here. And I'll say that. Kennedy, in Stewart, Judge Kaczynski cited language from Raich saying, We have never required Congress to make particularized findings in order to legislate absent of special concern such as the protection of free speech. Yes, sir. Well, his statement at footnote 6, that there's no individual right to bear arms, is no longer valid. We know that. Yes, sir. Yes. So now we have an interest, a fundamental interest in the Second Amendment, which is, for all we know, still developing, as important as the interest of free speech under the First Amendment. Does this legislation, which regulates guns, make specific findings that the manufacture of intrastate guns is a danger? Yes, and it doesn't matter, Your Honor. Let me start with the second. Even in the cases in which the Supreme Court has looked to legislative findings in the First Amendment, it has never required Congress to make findings to legislate. And in fact, the Supreme Court has said the opposite. Congress is not required to make findings to legislate. Nothing in Article I requires that. Nothing in any statute requires that. And when there are such findings, it is helpful in applying, for example, strict scrutiny under the First Amendment to decide whether Congress was legislating with respect to an interest that was of sufficient gravity. But nothing has ever no no case of the Supreme Court has ever required Congress to legislate with specific findings in order to enact legislation under its Article I powers. Secondly, the Gun Control Act does include findings, Your Honor, and it says there is a substantial interstate market in the sale of firearms, a point that nobody here contests, and that it is necessary and proper for Congress to regulate those transactions at the point of sale in order to ensure that guns don't end up in the hands of people who are intentionally insane and so on. That's, of course, all stuff that Congress has done for many years, and nothing in Heller brings that into question. And this is the last point I want to make in response to your question, Judge Beyer, is the claim in Heller was that the Second Amendment protects a right of law-abiding responsible citizens to use and bear arms in defense of hearth and home. And nothing in the scheme that Mr. Marbut wants to challenge here impinges on that right, because as I've explained, he is free to make his Montana buckaroo rifle, keep it in his house, and use it in defense of hearth and home. So the contention that the Second Amendment, which he's not in any event invoked in his complaint, somehow affects the commerce power question we think is without merit. Kennedy. What about the dual federalism issue that Montana has decided that in order to protect its own citizens, its citizens ought to be able to buy non-federally licensed guns manufactured in Montana? And that's a traditional basis of state concern, which is reserved under the Ninth and Tenth Amendments to the states. And therefore, the federal government should not encroach on the state's exercise of its traditional police power to protect its citizens through licensing manufacture of guns in Montana. I have a couple of things I'd like to say in response to that, Your Honor. The first is that, of course, that's not a Second Amendment claim qua Second Amendment. That would be a claim that the Second Amendment identifies some field that is sort of traditionally within state prerogatives. That is, of course, the inquiry under National League of Cities v. Usury that was overruled several years later in Garcia. So we know that the Court has said we don't engage in that kind of analysis anymore. Then, as even under the height of the National League of Cities analysis, Your Honor, and this, I think, goes directly to your point, even in the heyday of Usury and the National League of Cities' Tenth Amendment doctrine, it was always the case that the federal government and state governments could legislate separately with respect to the same private conduct. That's the Hodel case in the Supreme Court, Hodel v. Virginia Surface Mining Reclamation Association. In that case, the argument was very much like the argument that Amaki made here. It was that the Federal regulation of surface mining intruded on the traditional authority of the State of Virginia to regulate its use of lands and those who use its lands, and that preemption of the Virginia law would violate the Tenth Amendment. That's almost directly parallel to the claim here, and it was rejected in Hodel, because what the Supreme Court said was you don't even have to get to the questions that the Garcia court ultimately ended up overruling Usury on, namely, how do you identify a traditional State function. What it said was this is not the regulation of States, and the premise of the – of the Supremacy Clause is that the Federal government, as sovereign, may regulate the citizens of the United States, and the States, as sovereigns, may regulate their own citizens. And when those two regulations clash, the Supremacy Clause provides that the powers of Congress prevail. And, in fact, that analysis is in Raich itself. In Raich, one of the arguments was California in the Compassionate Use Act had purported to legalize the medical – use of medical marijuana. And one of the arguments that the Petitioners in Raich made to the Court was, well, the – at a minimum, Federal commerce power can't extend to those activities that the State has, in its sovereign judgment, decided to bless. And in a passage that I think has direct bearing here, the Supreme Court said, no, of course not. Congress – a State cannot, by the exercise of its police powers, withdraw or rescind from the Federal government power that the Constitution and the Commerce Clause grants to Congress. So the fact that a State chooses to say, in our judgment, people of this State should be able to do X or Y or Z may control for all purposes under State law. I don't know whether Montana construes the Montana Firearms Freedoms Act to have any effect on Montana State criminal prosecutions. But if it does, that is for Montana to decide. But what Montana cannot do is, by exercising its police power, withdraw from Congress powers that the Constitution grants to Congress. So for those reasons, we think the Tenth Amendment argument, to the extent there is one in this case, is foreclosed under Hodel and Garcia, and even under more recent cases like Comstock, where, again, the argument was it was State authority to regulate the detention of the sexually dangerous persons. And the Supreme Court said, no, the Commerce Clause and the Necessary and Proper Clause – that was the addition in Comstock – the Commerce Clause supported by the Necessary and Proper Clause allows Congress to enact this regulation, and therefore, it is not reserved to the States under the Tenth Amendment. So unless the Court has further questions, we'd ask the Court to affirm. Roberts. Thank you. Thank you, Your Honor. There's no debate that this Court and the branch that this Court serves in, the judicial branch, is an important – indeed, a key bulwark for liberty, for the individual citizens of the United States and for the states that are part of the Ninth Circuit. And what we would urge the Court to do is recognize that, likewise, the concept of dual sovereignty serves the same end. That is, dual sovereignty is recognized by the U.S. Supreme Court in Gregory against U.S., New York against U.S. The Supreme Court justices talk about dual sovereignty at length, and with great persuasiveness and passion, that dual sovereignty is important for the individual citizens of the United States within States and as a collective whole. And this Court serves the same purpose in a different way. And what we would urge is a heightened scrutiny in cases where Congress and the States clash, so that the Tenth Amendment and the Enumeration Clause in Article I are honored in such a way as to preserve some independent and robust power in the States, so that dual sovereignty remains part of the form of American government. Thank you. Thank you. We thank all counsel for your helpful arguments. The case just argued is submitted. That concludes this morning's argument calendar, and we are adjourned.
judges: Tashima, Clifton, Bea